LOUIS WEINSTOCK et al., Plaintiffs, *v.* HARRY LADISKY, as President, or MARTIN RARBECK, as Secretary-Treasurer, of District Council No. 9, Brotherhood of Painters, Decorators and Paperhangers of America for the Boroughs of Manhattan and The Bronx, Defendant.

Supreme Court, Special Term, New York County, May 18, 1950.

*Sacher & Sacher* for plaintiffs.

*David I. Ashe* for defendant.

HAMMER, J. The action herein is by the plaintiffs for a mandatory injunction commanding the defendant to reinstate them as members of the Brotherhood of Painters, Decorators and Paperhangers of America, from which they were expelled after trial.

There are two motions presented for decision. The plaintiffs have moved for an injunction *pendente lite* restraining defendant from interfering with or depriving plaintiffs of any of the rights which they have as members of the brotherhood. The defendant has cross-moved for an order dismissing the complaint on the ground that it does not state facts sufficient to constitute a cause of action. The complaint sets forth in its allegations all the facts and annexes to it the constitution of the brotherhood and a copy of the trial board's report. The affidavits supporting and against the motion for a temporary injunction reiterate or admit the facts shown in the allegations of and exhibits attached to the complaint. Plaintiffs assert interpretations, constructions and conclusions which are denied by defendant, whose affidavits also assert interpretations, constructions and conclusions. The facts shown by the complaint and its exhibits and also by the affidavits will be stated.

The defendant District Council No. 9, Brotherhood of Painters, Decorators and Paperhangers of America (hereinafter referred to as the " District Council " or as the " Union ") is a labor union of painters and paperhangers in the boroughs of Manhattan and The Bronx. It exists by virtue of a charter granted to it by the Brotherhood of Painters, Decorators and Paperhangers of America (hereinafter referred to as the " Brotherhood "), an international labor union organized at Baltimore, Maryland, March 15, 1887. It is affiliated with the American Federation of Labor. The District Council, in turn, consists of twelve local unions chartered by the Brotherhood in Manhattan and The Bronx. Each of these local unions elects delegates to the District Council. The Brotherhood, the District Council and the local unions are all voluntary, unincorporated associations.

Each plaintiff is a journeyman painter. Plaintiffs were admitted to membership in defendant and its locals, Weinstock in Local Union No. 499 in 1926, Gainer in Local No. 905 in 1935 and Davis in Local 1035 in 1927. Plaintiff Weinstock was until July, 1947, Secretary-Treasurer of the defendant District Council.

The Brotherhood is governed by a written constitution, which is binding upon the Brotherhood, all district councils, and all local unions, and all members of the Brotherhood.

The constitution of the Brotherhood provided in section 107 thereof as follows:

" (d) Any member who associates himself with any organization or group that expounds or promotes any doctrine or philosophy inimical to or subversi. of the fundamental principles and institutions of the government of the United States or Dominion of Canada, the American Federation of Labor or of this Brotherhood, shall be granted a hearing by the local and, if found guilty, shall be disciplined in the manner provided for in this constitution.

" (e) The German-American Bund, the Nazi Party, the Fascist Party, the Communist Party and organizations which subscribe to the doctrines of the foregoing, shall be conclusively presumed to be organizations within the condemnation of the foregoing section. The decision of the General Executive Board that an organization expounds and promotes principles condemned in the foregoing section, shall be final and binding.
\* \* \*

"(g) The foregoing sections and the authority conferred therein shall apply with equal force and effect to District Councils and other subordinate bodies."

The complaint alleges that the above provisions were added to the constitution of the Brotherhood in 1941, many years after each of the plaintiffs became a member of the Brotherhood. It is further alleged that none of the plaintiffs at any time prior to the commencement of this action assented to or acquiesced in the adoption and inclusion of said provisions in the constitution of the Brotherhood. It will be assumed that no act or word of any of the plaintiffs evidenced assent or acquiescence. Whether in law the new provision became binding upon them will be discussed later.

On December 7, 1949, charges were filed with defendant District Council against each of the plaintiffs under the above provisions of section 107 of the constitution. As to each of the plaintiffs the charges allege that he "* * * is a member of the Communist Party and has consistently associated himself with other organizations which subscribe to the doctrines of the Communist Party and which expound and promote doctrines and philosophies inimical to and subversive to the fundamental principles of the Government and the American Federation of Labor. He has consistently followed the Communist Party Line of sabotaging of Union activities within the Brotherhood and the District Council, thus causing untold and irreparable harm to the membership of the Union, to the entire Brotherhood and the American Federation of Labor." Each plaintiff was served with a copy of the charges and with a notice to appear for trial on January 28, 1950. On that date each plaintiff submitted to the District Council's trial board a typewritten statement challenging the authority of the District Council to exercise original jurisdiction of the charges brought under section 107 and stating each refused to stand trial or participate in the proceedings. The trial was adjourned to February 4th and thereupon each of the plaintiffs repeated this position. The trial board then proceeded with the trial of each of the plaintiffs, in the manner prescribed in the constitution. At the conclusion thereof, the trial board submitted a report to the District Council finding that each of the plaintiffs "is a member of the Communist Party and of organizations which subscribe to the doctrines of the Communist Party" and recommending that the plaintiffs be expelled from the Brotherhood. The District Council on March 1, 1950, approved and adopted the findings and recommendations

of the trial board. This procedure is also that set forth in the constitution.

Plaintiffs contend (1) that the charges preferred against them were vague and indefinite and in the circumstances the District Council and its trial board were without jurisdiction to try and to expel plaintiffs; (2) that section 107 of the constitution is contrary to public policy and the law of the land; (3) that no evidence was adduced before the trial board that the Communist party was an organization or group inimical to or subversive of the fundamental principles and institutions of the United States and of the American Federation of Labor and (4) that the expulsion of the plaintiffs being, as a matter of law, null and void, they have a right to apply directly to this court for the relief prayed for herein without exhausting their remedies with the Brotherhood.

It is shown that the plaintiff Weinstock in his written objections presented to the trial board stated that the charges were the same as charges filed against him in 1945 and which upon the trial at that time resulted in a dismissal by the District Council. It is contended that the charge made against each plaintiff that "he is a member of the Communist Party" is vague and indefinite. The fact is, nevertheless, that each plaintiff admits that he was and is a member of the Communist party. Under the circumstances it cannot be held that the charge was vague and indefinite, as each knew exactly and with definiteness what was meant by the language used. What union members understand by the language of such charge, and what Americans generally understand will be later discussed. Suffice it to say here that such an accusation has connotations which if spoken or written and not shown to be true would be actionable *per se* entitling the injured party to damages (*Mencher* v. *Chesley,* 297 N. Y. 94, 102; *Grant* v. *Reader's Digest Assn.,* 151 F. 2d 733, 735, certiorari denied 326 U. S. 797).

At the outset, plaintiffs' contention that section 107 is not binding upon them because they never assented or acquiesced in its adoption and inclusion in the Brotherhood constitution, will be considered first, because, if it be well founded, it would entitle them to the relief sought. The plaintiffs concede that except for reasons of race, creed, color or national origin (Civil Rights Law, § 43) a labor union may legally exclude any one it pleases from admission to membership, even upon the ground of membership in any particular political party. They allege that once a person has been admitted to membership and has thereupon acquired rights of membership, including the right to earn

a livelihood as such member, the union does not continue to have any such power. They assert as a conclusion that a union may not expel such a member for violation of a constitutional amendment later adopted, as in the present instance, making membership in the Communist party ground for expulsion. It is admitted by plaintiffs that in the existing state of the law a union may exclude from admission to membership any person who is a member of the Communist party solely on the basis of such membership. Plaintiffs' concession in effect is that if at the time of a given member's admission to such union its constitution or by-laws provided that membership in the Communist party was a cause for expulsion, the member could be expelled for joining such party. The theory of the concession apparently is that such a member would have violated the contract made with the union which he joined. Reliance for the position taken is placed in *Polin* v. *Kaplan* (257 N. Y. 277, 281). In respect of plaintiffs' statement that the defendant union as an original proposition had the right to fix qualifications and grant or refuse membership, it is fair to observe that the conceded matter is not open to question and in fact is no concession (*Simons* v. *Berry*, 210 App. Div. 90, 92; *Colson* v. *Gelber*, 192 Misc. 520; *Matter of Miller* v. *Ruehl*, 166 Misc. 479).

We advert to the plaintiffs' claim that they may only be expelled for breach of contract, under authority of *Polin* v. *Kaplan* (*supra*). Such a breach of the contract would furnish a good ground for such expulsion. What is overlooked is that were there a violation of the union's constitutional provision in respect of membership in the Communist party, such violation in and of itself would warrant such expulsion and if there were a contract, it is what would render the breach of contract of such substantial significance as to constitute an expellable offense. Under the circumstances the reason for a choice between these two grounds of expulsion would be insignificant.

The plaintiffs assert that the question posed by the present case is: May a union, whose constitution contains provision for its amendment, expel a member *solely* because of his membership in the Communist party, where the amendment was added to its constitution long after the member joined the union? Plaintiffs answer the question by asserting that under the general reservation of amending power existing here the contract may not be changed in an essential particular at the election of those in whose favor the reservation is made. The provision in question, plaintiffs charge, is a radical change in the contract which was not within the contemplation of the parties.

As plaintiffs rely on *Polin* v. *Kaplan* (*supra*) it is deemed appropriate to make note of a quotation therefrom (pp. 281–282): "The constitution and by-laws of an unincorporated association express the terms of a contract which define the privileges secured and the duties assumed by those who have become members. As the contract may prescribe the precise terms upon which a membership may be gained, so may it conclusively define the conditions which will entail its loss. Thus, if the contract reasonably provides that the performance of certain acts will constitute a sufficient cause for the expulsion of a member, and that charges of their performance, with notice to the member, shall be tried before a tribunal set up by the association, the provision is exclusive, and the judgment of the tribunal, rendered after a fair trial, that the member has committed the offenses charged and must be expelled, will not be reviewed by the regularly constituted courts. (*Belton* v. *Hatch*, 109 N. Y. 593; *Matter of Haebler* v. *N. Y. Produce Exchange*, 149 N. Y. 414.) A court 'cannot review the proceedings or re-examine the merits of the expulsion.' (Per MILLER, J., in *Wilcox* v. *Royal Arcanum*, 210 N. Y. 370, 376.)"

In *White* v. *Brownell* (2 Daly 329, 338) the court in reference to an unincorporated association said: "The constitution of the association, and its laws agreed upon by the members, contains all the stipulations of the parties, and is the law which should govern. The members have established a law for themselves. * * * The court must regard the constitution and laws of this board as the contract by which all the members are bound. The court cannot make any other contract for the parties than they have solemnly made for themselves."

Looking at the constitution of the Brotherhood it is found that prior to the 1941 convention it was provided therein that: "*No member shall* at any given time belong to more than one local union of the Brotherhood, nor become a member of any dual organization of painters, decorators or paperhangers, nor *become a member in nor affiliated with*, in any way whatsoever, the German-American Bund, nor the Nazi Party, nor *the Communists' organization*, nor any other foreign alliance opposed to the principles of the American Federation of Labor, *under penalty of expulsion*". (Emphasis mine.) (At the 1941 convention the above provision was renumbered as section 107 and was amended to read as heretofore set forth.) In the circumstances, the amendment to the constitution must be said to be a gradual, progressive, evolutionary change and not a radical one in the constitution and laws of the union. This is so regard-

less of whether it was within the contemplation of the parties when plaintiffs entered into membership in the union. The United States District Court for the District of Columbia in the case of *Durkin* v. *Murray* (90 F. Supp. 367, 368–369), *inter alia* held: " Plaintiffs seek to justify their failure to exhaust their remedies within the CIO by concluding and alleging in their complaint that the CIO had no right to amend its Constitution to provide for expelling a union for devoting itself to the program of the Communist Party rather than the objectives of the CIO; that the UOPWA's certificate of affiliation with the CIO constitutes a compact barring the revocation of that certificate and that the expulsion procedures are improper or illegal. It does not appear to the Court from the Complaint and from plaintiffs' exhibits that such conclusions are warranted."

The terms of the contract between an unincorporated association such as a labor organization, and its members are expressed in its constitution and by-laws. When the constitution provides for future amendments by the vote of the membership in a manner provided, that is a term as binding and enforcible as are the other presently expressed terms.

In *Everett* v. *Supreme Council, Catholic Benevolent Legion* (236 N. Y. 62, 68) it was held: " Where the reservation of authority to amend a charter or the constitution and by-laws of a society is clear, the right to have the rate of assessment and the amount of benefits continued as originally provided is not vested or fixed beyond the possibility of reasonable changes to meet new conditions."

The holding in *Kehlenbeck* v. *Logeman* (10 Daly 447) requires that the issue of the alleged unreasonableness of the amendment expressed in section 107 must be resolved against the plaintiffs. There (pp. 448–449) it is stated: " It has been held in this court upon more than one occasion that in respect to the by-laws of a voluntary association the court has no visitorial power, and cannot determine whether they are reasonable or unreasonable, and the only question which it can examine is whether they have been adopted in the way which has been agreed upon by the members of the association."

No issue is presented questioning that section 107 was adopted in the manner and by the vote required by the constitution of the Brotherhood. The facts show it was duly and properly adopted (*Cipriano* v. *Societa San Salvatore,* 161 N. Y. S. 284). It was therefore a valid amendment binding upon all the members.

Every association is under the duty to protect the interests of its general membership rather than that of a few individual members. The private interest of the individual is subservient to the general good of the whole body (*Marshall* v. *Pilots' Assn.*, 18 Pa. Superior Ct. 644, 651).

While plaintiffs appeal to public policy to protect them in the pursuit within the defendant union of their avowed purposes as communists, public policy as it is expressed in the Labor Management Relations Act of 1947 (U. S. Code, tit. 29, § 141, § 159, subd. [h]) amending the National Labor Relations Act of 1935 (U. S. Code, tit. 29, § 151 *et seq.*) indicates that any such appeal is futile. Subdivision (h) of section 9 of that act denies the use of all facilities of the National Labor Relations Board and all benefits of the Labor Management Relations Act to a labor union " unless there is on file with the Board an affidavit executed contemporaneously or within the preceding twelve-month period by each officer of such labor organization and the officers of any national or international labor organization of which it is an affiliate or constituent unit that he is not a member of the Communist Party or affiliated with such party,' and that he does not believe in, and is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods." The constitutionality of subdivision (h) of section 9 was upheld by the Supreme Court of the United States on May 8, 1950 (*United Steelworkers of America* v. *National Labor Relations Board,* 339 U. S. 382).

Senator Wayne Morse, former Dean of the University of Oregon Law School, in opposing the Taft-Hartley Act, made a statement in the Senate on May 13, 1947, which may well be regarded as expressive of the viewpoint of all the senators relative to communism. He said (Cong. Rec., p. 5109; col. 2): " I need not reiterate my opposition to Communists and their beliefs. I shall fight communism with all my energy because it destroys the liberties of freemen. I want to say that communism must be stamped out of the free labor movement of this country, if we are to preserve the rights of free workers and protect the dignity of the individual."

In *National Maritime Union of America* v. *Herzog* (78 F. Supp. 146) the statutory three-judge court of the District of Columbia in the course of its opinion said:

" Before the enactment of the Taft-Hartley Act, of which § 9(h) is a part, extensive hearings were conducted by congressional committees at which alarming evidence was presented

that Communists in positions of authority in trade unions tend to foment industrial unrest and strife, not to attain legitimate economic aims, but to serve political purposes; that they thus impede the flow of commerce in the very teeth of the Act's purpose to promote it. Quotations from the abundant evidence presented to the Committee would prolong this opinion unduly. Suffice it to say it afforded ample basis for the formation of a legislative policy to curb Communist influence in labor relations.'' (P. 162.)

'' In view of the avowed purpose of both the Wagner Act and the Taft-Hartley Act to bring about a *peaceful* solution of labor quarrels, and the discernible purpose of the Communist Party to foment strikes and industrial disorders, Congress could well conclude that persons occupying key positions in the administration of labor laws should not be subject to conflicting loyalties or interests.'' (P. 171.)

'' Admission is sought here to the arena of exclusive bargaining in which the conduct of the agent will affect not only the rights of its members and all other employees, but the interests of the public too. Accordingly, having with good reason diagnosed Communism as a contagion which is deleterious to labor relations, Congress has the power to ask a prospective bargaining agent whether he is so afflicted.'' (P. 171.)

The House of Representatives Committee on Education and Labor has stated (H. Rep. No. 245; 80th Cong., 1st Sess., p. 39) : '' Communists use their influence in unions not to benefit workers, but to promote dissension and turmoil.'' The Communist party and numerous organizations '' fronting '' for it are listed as subversive by the Attorney General of the United States. And President Truman, in his veto message to Congress after the first passage of the Taft-Hartley Bill, said (Cong. Rec., p. 7488) : '' Congress intended to assist labor organizations to rid themselves of Communist officers. With this objective I am in full accord.'' J. Edgar Hoover, Director of the Federal Bureau of Investigation, has branded domestic communists as belonging '' body and soul '' to the '' Red Hitler '' at Moscow and has asserted that by seeking to destroy the fabric of democracy they have forfeited their constitutional liberties. (Address, Masonic Grand Lodge of State of New York, Hotel Astor, May 2, 1950, the *New York Times,* May 3, 1950, p. 3, col. 1.) General Douglas MacArthur in advising the Japanese people to consider possible illegalization of the Japanese Communist party, pointed out that while the Communist party '' professes championship of the workers' rights in order to enlist support within labor's

ranks, events abroad demonstrate that the worker loses all rights under Communist political rule ''. The general warned:

'' The issue is therefore clear and unequivocal — how far may the fundamental human rights be exercised unabridged without becoming the instrument of their own destruction?

'' It is an issue which confronts all free peoples forewarned that others have lost their liberties because, blindly following an ideal, they have failed to see the dangers inherent in reality. While it is the universal desire of all free men to preserve unabridged the exercise of their personal liberties, there is thus an issue projected into every law-abiding society which may not be ignored without hazarding the survival of liberty itself.'' (*New York Times*, May 3, 1950, p. 16, col. 6.)

The Smith Act (U. S. Code, tit. 18, § 2385), to which reference is made below, is declarative of the policy of the United States Government to rid itself of communism and supporting groups. All three branches of our Government have recognized the dangers of communism and communists. The communist threat to the American trade union movement also has been exposed by trade union leaders. In 1948, President Philip Murray of the Congress of Industrial Organizations attacked communist leaders of unions who condemned their own country but failed to criticize '' a single solitary thing that Russia has done since the end of the war '' (Tenth Constitutional Convention of the Congress of Industrial Organizations, November 22, 1948, Portland, Oregon, *New York Times*, p. 1, col. 5). At the same convention, Walter Reuther, president of the United Automobile Workers, castigated those bent on destroying the American labor union and said that '' they have a simple question to resolve in their own minds and their own hearts. It is a question of loyalty. Are they going to be loyal to the CIO or loyal to the Communist Party? Are they going to be loyal to this country or loyal to the Soviet Union? You cannot be loyal to both.'' (*New York Times*, Nov. 23, 1948, p. 2 col. 3.) William Green, President of the American Federation of Labor, in a broadcast of September 6, 1948, warned of the hypocrisy of communism and told of efforts of communists to capture control of unions. Mr. David Dubinsky, President of the International Ladies Garment Workers Union, has stated that '' the spirit and aims of totalitarian communism are totally distinct from and hostile to ideals and policies of free trade unionism. * * * communism, in unions and other organizations, is conspiratorial. It is based on the elimination of majority rule. It aims to establish the one-party state as the sole power over all groups.

\* \* \* Free, democratic trade unionism and communism do not mix. One cancels out the other. To be free, the unions must keep the Communists out of leadership which they would use to advance their party interests '' ('' A Warning Against Communists in Unions,'' *New York Times Magazine*, May 11, 1947, pp. 7, 64). Speaking at a section meeting of the American Civil Liberties Union, held at the Waldorf Astoria Hotel in New York, on February 22, 1950, Mr. Will Herberg of the International Ladies Garment Workers Union said: '' All this (the rights of unpopular minorities), however, has no relation to Communists. Communists do not constitute a union minority in the ordinary sense. Communists constitute an anti-union force in the service of a foreign dictatorship whose purpose it is to destroy all labor organization and to subject mankind to ruthless totalitarian slavery. Communists are enemies of the labor movement in the same sense as people serving as undercover agents of openshop employers; indeed, they are far more pernicious than the latter could ever be. \* \* \* Allegiance to the Communist Party seems to me to be an obvious disqualification for any position of power, trust or influence, whether it be in the Government, in the educational system or in trade unions.''

The obvious conclusion is that section 107 is not contrary to the public policy of the United States.

It should be noted that voluntary, unincorporated associations, including labor unions, have inherent power, somewhat akin to the police power of a State, to provide for the welfare of their members and to regulate their affairs so as to attain the objects and purposes for which they were constituted. Aside from and independent of any provisions in its constitution and by-laws, a labor union has the right of self-protection and self-preservation, and may discipline a member or officer for conduct tending to thwart or destroy its objects. Such power may be exercised even to the extent of expelling a member from the organization (*Polin* v. *Kaplan*, 257 N. Y. 277, 282–283, *supra; Yockel* v. *German American Bund*, 20 N. Y. S. 2d 774, 777; *Belkin* v. *Spiegel*, N. Y. L. J., Dec. 29, 1938 p. 2360, col. 3; *Otto* v. *Tailors' P. & B. Union*, 75 Cal. 308, 314; *Weiss* v. *Musical Mut. Protective Union*, 189 Pa. 446; Martin on Modern Law of Labor Unions, § 306, p. 380; *License Cases*, 5 How. [U. S.] 504, 583; *People* v. *Ryan*, 230 App. Div. 252, 255). The rule is succinctly stated in Martin on Modern Law of Labor Unions as follows: '' The power to expel or otherwise punish a member for conduct in violation of its fundamental objects, and which if persisted in would have

a tendency to thwart or destroy such objects or bring the union into disrepute is inherent in the union.''

The Court of Appeals, in *Polin* v. *Kaplan* (*supra,* p. 283) also gave recognition to and reiterated the principle that in every union constitution '' There inheres a term binding members to loyal support of the society in the attainment of its proper purposes, and that for a gross breach of this obligation the power of expulsion ˙is impliedly conferred on the association.''

While it must be found that the plaintiffs have failed to exhaust their remedies under the Brotherhood constitution (*Browne* v. *Hibbets,* 290 N. Y. 459, 465; *Lafond* v. *Deems,* 81 N. Y. 507, 514; *Keller* v. *Lindelof,* 268 App. Div. 877, affd. 294 N. Y. 717; *Cabana* v. *Holstein-Friesian Assn.,* 196 App. Div. 842, 850, affd. 233 N. Y. 644) and that would suffice to dispose of the motions presented, if the motions may be decided on the merits and the litigation thus brought to finality, then obviously it would be proper to make such a final determination.

In the interest of such finality, therefore, the charges by plaintiffs that the amendment in question is contrary to public policy as an unwarranted abridgment of the freedoms guaranteed by the First Amendment to the Federal Constitution, is the equivalent of a bill of attainder and is violative of the Fourteenth Amendment to the Constitution, will be accorded further consideration.

It must be clear that the amendment attacked does not infringe on the political rights of the plaintiffs. In the public forum they may talk, act and vote as they have a mind to, provided they violate no public law. Section 107 of the Brotherhood constitution in no way interferes with the rights of the plaintiffs to hold or express any views or to belong to any organizations with which they choose to affiliate themselves. Their own acts and not those of the union made them members of the Communist party, an organization declared by the union to be hostile to its fundamental purposes. Their own acts of disloyalty to their union, the defendant, subjected each of them to discipline. That a labor union has the power to expel a member for failure to support '' the society in the attainment of its proper purposes '', is the holding of the very authority upon which they rely (*Polin* v. *Kaplan, supra,* pp. 282–283).

The basic fallacy in plaintiffs' argument concerning interference with their political rights is their assumption that as members of the Communist party they have standing identical with members of other political parties. Of the major parties,

one is in control through persons of its choice of the executive branch of the Government and usually of the legislative branch and is the party answerable to the people for the administration of those branches. The other party is the opposition and critic of the acts and failures of the party in control. Both parties act under and within the Constitution and laws. The main object of the Communist party, on the contrary, is the overthrow by force, if required, of the Government of the United States and of its Constitution and laws and the substitution in place thereof of the Soviet communistic totalitarian dictatorship. All public officials and officers as a qualification for office take an oath to support the Constitution and laws of the United States, and, if a State office, also of the State. Obviously communists could not honestly and truthfully take that oath. If such were taken, they would be guilty of willful deception and fraud as under its cover their party allegiance would require them to conspire and hatch plots for treason, and upon opportunity to spring into destructive action. Plaintiffs assert no evidence was adduced at their trial showing that the Communist party was inimical and subversive to the United States and the American Federation of Labor. The evidence presented to the trial board was that as Communist party members the plaintiffs at union meetings preached the superiority of the Soviet Union to the United States and its form of government to the American form — they predicted the fall of China to communism and stated that the United States would be next; they prophesied a depression in this land, which our laws and economic system would be powerless to avert, and which they hoped would hasten the subjection of this country to communism; and they solicited candidates and funds from their fellow union members for the Communist party. The evidence, among other things, showed that three articles on Hungary appeared in the communist paper, the *Daily Worker,* written by Weinstock and his communist standing and leadership were described. There was evidence also that he was a member of the national committee of the Communist Political Association, and that he conducted a course on Marxism and labor at the Jefferson School, a subversive organization, and was grand marshal of the May day parade, of which the organizing committee was also a subversive organization. The evidence showed statements by Gainer that he admitted being a communist; also showed him to be a member of the Communist Political Association and heading the list of sponsors of the May day committee, and other documents in evidence showed he participated in communist front organiza-

tions. The evidence showed Davis to be a member of the Communist party and of the Painters Educational Forum, a communist group, which in 1950 conducted a meeting at which Davis, Weinstock, Gainer and Jack Stachel, one of the eleven communists recently convicted in the Federal District Court, were listed as speakers. The evidence also showed the distribution at union meetings of communist leaflets by Davis and that he urged members to join the Communist party, and documents in evidence showed his participation in communist front organizations. The report of the defendant Union's trial board on the charges against Weinstock, Gainer and Davis reciting the findings and supporting evidence as is noted above, is annexed to the complaint and is part thereof. Such conduct on the part of the plaintiffs was anticountry and antiunion and completely political. Their adherence to the party line, and their acts and statements, foreshadow a resort to violence, a substitution of force for reason, and of bullets for ballots.

There are many instances in which workers have been deprived of their democratic rights, where the courts have granted the required relief (*Irwin* v. *Possehl,* 143 Misc. 855, 858). There are also many instances where under the pretense of constitutional protection union members have sought to continue nefarious acts contrary to the interests of union, of labor and of country, in which the authority of the union was upheld by the courts (*Ames* v. *Dubinsky,* 70 N. Y. S. 2d 706, and cases there cited). The emphasis upon the Bill of Rights and the Fourteenth Amendment pointedly brings to mind another section of our Constitution, that defining treason against the United States as '' levying War against them, or in adhering to their Enemies, giving them Aid and Comfort.'' (U. S. Const., art. III, § 3.) The American people have come to the realization that too many assert the protection afforded by the Bill of Rights and the Fourteenth Amendment while engaged in conduct closely approximating that definition of treason. We have held that the Brotherhood in its constitution not only had the right to provide the terms upon which membership might be gained, but by providing the reservation of amendment it also had the right to define reasonable conditions for continued membership. Section 107 was enacted by the Brotherhood to defend itself from those who would destroy it, and who would give '' Aid and Comfort '' to a foreign power, and to organizations and institutions commonly known and labeled as enemies of the United States and of the defendant's parent body, the American Federation of Labor (*Polin* v. *Kaplan, supra; L'Hommedieu* v. *Board*

*of Regents,* 276 App. Div. 494; *Lederman* v. *Board of Education,* 276 App. Div. 527).

Contrary to the claim of plaintiffs, section 107 is not equivalent to a bill of attainder. A bill of attainder " is a legislative act inflicting punishment without a judicial trial " (16 C. J. S., Constitutional Law, § 452, p. 902, and footnotes). Bills of attainder have been said to be also *ex post facto* because passed after the commission of the offense which is to be punished. Chief Justice MARSHALL stated the accepted definition of an *ex post facto* law as " one which renders an act punishable in a manner in which it was not punishable when it was committed " (*Fletcher* v. *Peck,* 6 Cranch [U. S.] 87, 138). The constitutional prohibition on bills of attainder applies to legislative enactments passed after the commission of the offense which is to be punished. The defendant's section 107 does not create a penalty for past conduct not then an offense or increase a penalty for past misconduct and it does not inflict punishment without a trial. It operates prospectively and only in future. The constitution of the Brotherhood requires the service of charges upon the accused. Section 107 specifically provides that before a penalty may be imposed for its violation the accused member " shall be granted a hearing " and must first be " found guilty ". This constitutes due process and cannot be said to be a bill of attainder (*United States* v. *Lovett,* 328 U. S. 303; *L'Hommedieu* v. *Board of Regents, supra*).

Plaintiffs' complaint alleges that the defendant District Council did not have jurisdiction to try them on the charges against them under section 107. This contention was made before the union's trial board. Section 285 of the Brotherhood constitution sets forth the original jurisdiction of the district councils over certain types of charges. The question of which body or bodies shall have original jurisdiction of charges under section 107 is not referred to anywhere in the entire constitution except in section 107 itself.

Subdivision (b) of section 284 of the constitution provides: " Local unions shall have original jurisdiction only. District councils, the General Executive Board, and the Convention shall have original and appellate jurisdiction; as provided in this constitution."

Subdivision (d) of section 107 provides that any member charged with its violation " shall be granted a hearing by the local and, if found guilty, shall be disciplined in the manner provided for in this constitution." Section 107 then goes on to provide in subdivision (g): " The foregoing sections and the

authority conferred therein shall apply with equal force and effect to District Councils and other subordinate bodies.''

In March, 1949, the General Executive Board acted on an appeal by a member of the Brotherhood against this defendant District Council, that the council had failed to act on charges under section 107 filed with the council by that member. On March 31, 1949, the General Executive Board sent its decision to the defendant council, ruling that '' the district council must act on these charges.'' Courts, in interpreting the constitutional provisions of an unincorporated association, will accept the interpretations placed on such provisions by the organization itself through its officers and authorized tribunals (*Simpson* v. *Grand Int. Brotherhood of Locomotive Engineers,* 83 W. Va. 355, certiorari denied 250 U. S. 644; *Shaup* v. *Grand Int. Brotherhood of Locomotive Engineers,* 223 Ala. 202; *Pratt* v. *Amalgamated Assn. of Ry. Employees,* 50 Utah 472; 63 C. J., Trade Unions, § 13, p. 663; Oakes on Organized Labor and Industrial Conflicts, § 22, p. 32).

Section 64 of the Brotherhood constitution provides: '' The General Executive Board shall decide all points of law arising under the jurisdiction of the Brotherhood and also all grievances and appeals  *  *  *.'' The conclusion is that the defendant District Council did have jurisdiction to entertain and try the charges against the plaintiffs.

The Smith Act (U. S. Code, tit. 18, § 2385) makes it a crime knowingly to advocate the overthrow of the government by force or violence or to organize or, with knowledge of its purposes, belong to any group that advocates such overthrow. From the foregoing it is obvious that combinations or agreements directed towards establishing a communist dictatorship are not innocent activities. There is no constitutional objection to punishing evil-purpose agreements. If the provisions here considered do abridge any rights of speech, press and peaceable assembly, there is authority for the view that there exists a clear and present danger sufficient to authorize any such possible abridgement as is claimed by plaintiffs to be present in section 107 (*Schenck* v. *United States,* 249 U. S. 47, 52; see *Hartzel* v. *United States,* 322 U. S. 680). That there is such a clear and present danger appears to be the unanimous view of the leaders of American labor, as we have previously indicated.

While ordinarily facts may not be established by mere legislative declaration and constitutionally should be found only by the courts (see *Tot* v. *United States,* 319 U. S. 463 and *Manley* v. *Georgia,* 279 U. S. 1), the evils and dangers of communism to

trade unionism and the American democratic form of government are so notorious that a legislative finding of clear and present danger is entitled to very great weight (*Whitney* v. *California,* 274 U. S. 357). The amendment under consideration (§ 107) is as clear and definite as it can be made in view of the evil it is designed to combat. It is sufficiently clear and definite so as not to constitute a violation of the due process clauses of the United States and New York State Constitutions.

It is a matter of common knowledge that the vast majority of the American people view the dangers of international communism both as a threat to our domestic institutions and as a menace to our peace and security. The ruthlessness and unscrupulousness of the communists and their skill in the use of deception to advance their cause is also a matter of common knowledge. It follows that there is imminent necessity for action to be taken to protect trade unionism and the country against these dangers and that the adoption of section 107 was such action, both reasonable and proper. In consequence, the trial, conviction and expulsion of plaintiffs on the charges served upon them, alleging the violation of section 107, must be held to have been in the lawful exercise by the defendant union of its rights under its constitution.

For the reasons stated, the plaintiffs' motion for a temporary injunction is denied and defendant's cross motion to dismiss the complaint as insufficient in law is granted.