364 F.2d 67
 Leo HURWITZ, Lee R. Bobker, Robert Braverman, Gene Searchinger, Darrell Random, and Hilary T. Harris, on their own Behalf and on Behalf of all others similarly situated as members of the Screen Directors International Guild, Appellants,
v.
DIRECTORS GUILD OF AMERICA, INCORPORATED, Appellee.
 No. 329.
 Docket 30215.
 United States Court of Appeals Second Circuit.
 Argued April 12, 1966.
 Decided July 14, 1966.
 
 Nanette Dembitz, New York City (Melvin L. Wulf, American Civil Liberties Union, New York City, on the brief), for appellants.
 Bernard Axler, New York City (Phillips, Nizer, Benjamin, Krim & Ballon, New York City, on the brief), for appellees.
 Before LUMBARD, Chief Judge, and WATERMAN and ANDERSON, Circuit Judges.
 LUMBARD, Chief Judge.
 
 
 1
 This is an appeal from an order of the United States District Court for the Southern District of New York denying in all respects plaintiffs' motion for a preliminary injunction. In the underlying lawsuit, the plaintiffs have sued to restrain the survivor of a merger between two unions from enforcing upon the members in good standing of the submerged union the defendant-survivor's pre-existing requirement that all its members sign a non-Communist oath. In their motion for a preliminary injunction, plaintiffs sought an order either delaying the merger pendente lite or requiring the defendant to admit the plaintiffs to membership pending the outcome of this litigation. We hold that imposition of the vague oath in question was an unreasonable basis for divesting plaintiffs of their long-standing privilege of union membership. Accordingly, we reverse the order of the district court and remand the cause with instructions that the trial court grant such final relief to the plaintiffs as may be appropriate.
 
 I. BACKGROUND OF THIS APPEAL
 
 2
 For many years, the nation's film and television directors were represented by two independent unions, the Directors Guild of America, Inc. (DGA), functioning largely in the West Coast area, and the Screen Directors International Guild (SDIG), a smaller union functioning largely in the East Coast area. Almost from its inception in 1957, the younger SDIG negotiated with DGA to effectuate a merger of the two organizations. Through such a merger, the unions hoped to secure the economic advantages and the collective bargaining strength of a single, nation-wide directors' union.
 
 
 3
 A major stumbling block to such a merger was Article III, Section H of the DGA constitution, which requires all DGA members to swear to an oath reading:
 
 
 4
 "I am not a member of the Communist Party or affiliated with such party, and I do not believe in, and I am not a member [sic] nor do I support any organization that believes in or teaches the overthrow of the United States government by force or by any illegal or unconstitutional methods."
 
 
 5
 According to the plaintiffs' affidavits below, this membership oath was adopted by DGA under the pressures of McCarthy era "witch hunts" against suspected subversives in the Hollywood film industry. SDIG never found it necessary to adopt such an oath requirement.
 
 
 6
 At an SDIG meeting in January 1965, a majority of the members present passed a resolution condemning the DGA's loyalty oath requirement. Nevertheless, on or about July 19, 1965, officials of the two unions signed a proposed merger agreement. Under this agreement, DGA would be the surviving union. SDIG members would become automatic members of DGA, with insurance and other benefits but with no initiation fee assessment, on the single condition that they sign the DGA loyalty oath. To insure that SDIG members would have a proportionate voice in the management of the surviving union, the agreement also provided that the members of SDIG would vote in the fall of 1965 to elect two members to the DGA National Board and thirteen members to the DGA Eastern District Council.
 
 
 7
 Whatever philosophical objections the SDIG rank and file had to the DGA loyalty oath must have been outweighed by the material advantages of merger, for they ratified the merger agreement by a vote of 439 to 63. On August 28, 1965, ballots were mailed to all SDIG members for the elections described in the agreement. The ballots contained instructions that any SDIG member who failed to execute and file the non-Communist oath would not be considered a DGA member. The ballots of those who signed the oath were to be counted on September 27, 1965, and the merger agreement made final on October 9.
 
 
 8
 On September 17, 1965, the six plaintiffs, who had been members in good standing of SDIG, brought this action to declare the DGA oath "illegal and unconstitutional," and to direct DGA to admit them to membership without regard to their signing the oath. On the same day, plaintiffs moved for a temporary restraining order and preliminary injunction directing DGA to accept SDIG members as members of DGA without regard to the oath, and enjoining DGA from barring plaintiffs from voting in the September DGA elections because of their refusal to subscribe to the oath.
 
 
 9
 On September 23, 1965, Judge Levet denied the motion for a preliminary injunction on the alternative grounds that the plaintiffs were not likely to succeed after a trial on the merits, and that the plaintiffs had not established that irreparable injury would result if the preliminary injunction were denied.
 
 
 10
 Though the ballots were due to be counted on September 27, the plaintiffs elected not to seek an immediate appeal of Judge Levet's order. Instead, they moved to reargue on October 11, which motion Judge Levet denied on October 27. In the meantime, the ballots of those who signed the oath were counted, the winning SDIG members were seated by DGA on its National Board and Eastern District Council, and the merger agreement was executed in final form. Plaintiffs filed their notice of appeal on November 22, 1965.
 
 II. SCOPE OF APPELLATE REVIEW
 
 11
 This appeal reaches us in a curious posture. The plaintiffs' motion for a preliminary injunction is moot to the extent that it sought to interfere with the DGA elections completed in September 1965. However, the plaintiffs also requested a mandatory preliminary injunction compelling DGA to admit them to membership in the surviving union pendente lite. The district court's denial of this portion of plaintiffs' motion is not moot, since plaintiffs have continued to refuse to sign the oath and DGA has continued to refuse them membership.
 
 
 12
 As it is our opinion that the DGA loyalty oath is per se an unreasonable and unlawful requirement for union membership, an initial question is whether this court may go beyond review of the denial of a preliminary injunction and direct entry of a judgment for plaintiffs on the merits.
 
 
 13
 The Judicial Code merely states that "The courts of appeals shall have jurisdiction of appeals from: (1) Interlocutory orders * * * refusing * * * injunctions." 28 U.S.C. § 1292 (a) (1). As a general rule, when an appeal is taken from the grant or denial of a preliminary injunction, the reviewing court will go no further into the merits than is necessary to decide the interlocutory appeal. See Ex parte National Enameling & Stamping Co., 201 U.S. 157, 162, 26 S.Ct. 404, 50 L.Ed. 707 (1906); Drittel v. Friedman, 154 F.2d 653 (2 Cir. 1946); Sheldon v. Moredall Realty Corp., 95 F.2d 48 (2 Cir. 1938); 6 Moore, Federal Practice ¶ 54.08[1] (2 ed. 1965). However, this rule is subject to a general exception — the appellate court may dismiss the complaint on the merits if its examination of the record upon an interlocutory appeal reveals that the case is entirely void of merit. See, e. g., Mast, Foos & Co. v. Stover Mfg. Co., 177 U.S. 485, 495, 20 S.Ct. 708, 44 L.Ed. 856 (1900); Sheldon v. Moredall Realty Corp., supra; 7 Moore ¶ 65.21, at p. 1702 (2 ed. 1955).
 
 
 14
 Such an exception serves the obvious interest of economy of litigation, and this interest is equally served if the appellate court directs a verdict for plaintiff in an appropriate case. We have found no case reaching this result, but this is not surprising since it is the rare case that contains no triable issue of fact, and it is rarer still that this would result in a judgment for the plaintiff at the pre-trial stage. In Meccano, Ltd. v. John Wanamaker, 250 F. 450 (2 Cir. 1919), aff'd, 253 U.S. 136, 141-142, 40 S.Ct. 463, 64 L.Ed. 822 (1920), we expressly refused to pass upon this question because the plaintiff did not warrant final relief. Finding no reason why the cautious exercise of such a power would be undesirable, we conclude that we may direct the entry of a judgment for the plaintiffs here.
 
 
 15
 For the reasons explained below, we conclude that the DGA oath is unreasonable as a matter of law and that plaintiffs should prevail on the merits. Since that portion of the appeal from Judge Levet's denial of a preliminary injunction which is not moot seeks relief pendente lite that will be granted permanently (namely, to compel DGA to admit plaintiffs to membership without regard to their signing the oath), we turn to the merits of the plaintiffs' action.
 
 III. LOYALTY OATHS AND UNION MEMBERSHIP
 
 16
 Whether a union may require its members to sign a non-Communist oath is a difficult question and apparently one of first impression. At first glance, it might seem that the oath is clearly reasonable in light of American Communications Association v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1950), where an evenly-divided Supreme Court upheld the constitutionality of Section 9 (h) of the National Labor Relations Act,[1] which barred the N. L. R. B. from acting on behalf of any union whose officers had not filed with the Board an oath substantially identical to that required by DGA here. However, even leaving aside the question whether that decision has been overruled by later opinions such as United States v. Brown, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965), we do not think it controls the issue of whether such an oath is a reasonable requirement for union membership.
 
 
 17
 Plaintiffs' principal contention, and the only one we will consider, is that the DGA loyalty oath as applied here results in an expulsion of plaintiffs from the union which is contrary to the common law of New York.[2] Plaintiffs claim that they are entitled to reinstatement under the well-settled principle that a union may only expel one of its members after a procedurally adequate hearing at which it is established that the member has violated a valid provision of the union's constitution or by-laws which authorizes his expulsion. See, e. g., Madden v. Atkins, 4 N.Y.2d 283, 174 N.Y.S.2d 633, 151 N.E.2d 73, 74 A.L.R.2d 772 (1958); Polin v. Kaplan, 257 N.Y. 277, 177 N.E. 833 (1931); Summers, Legal Limitations on Union Discipline, 64 Harv.L.Rev. 1049, 1051-56 (1951).
 
 
 18
 With respect to this count, defendant claims first, that the plaintiffs were excluded rather than expelled from membership in DGA, and that under New York law the grounds for union exclusions will not be reviewed by the courts; and second, that even if the denial of DGA membership here is termed an expulsion, it was predicated upon a loyalty oath which, under all the circumstances, is a reasonable and non-discriminatory prerequisite to union membership.
 
 
 19
 A. Expulsion or Exclusion?
 
 
 20
 The common law has generally classified labor unions as voluntary associations having great freedom to regulate their internal affairs, including their membership policies, without judicial interference. A wrongful expulsion from a union has traditionally been actionable. See Cox, The Role of Law in Preserving Union Democracy, 72 Harv. L. Rev. 609, 613-19 (1959). However, union expulsions have not been set aside because of their adverse impact on a member's opportunities to keep his job or to associate with his fellow workers. Rather, an improper expulsion has been viewed as a violation of a member's contract with his union, as represented by the organization's constitution and bylaws, or as a deprivation of the member's property rights in the assets of the union. See Polin v. Kaplan, 257 N.Y. 277, 177 N.E. 833 (1931); Angrisani v. Stearn, 167 Misc. 728, 729, 3 N.Y.S.2d 698 (Sup.Ct.), aff'd mem., 255 App.Div. 975, 8 N.Y.S.2d 997 (1938).[3] See generally Chafee, The Internal Affairs of Associations Not for Profit, 43 Harv.L. Rev. 1001 (1930).
 
 
 21
 The contract and the property theories provide no protection to an applicant for union membership since he has no such vested contract or property rights at stake. For this reason, and because the law has likened unions to social clubs having unlimited discretion over admission policies, few courts have recognized a cause of action for wrongful exclusion from union membership. See generally Summers, The Right to Join a Union, 47 Colum.L.Rev. 33 (1947). Though the New York Court of Appeals has apparently not passed on the question, a number of lower New York courts have taken this position. See Colson v. Gellier, 192 Misc. 520, 80 N.Y.S.2d 448 (Sup.Ct.1948); Murphy v. Higgins, 12 N.Y.S.2d 913 (Sup.Ct.1939), aff'd mem., 260 App.Div. 854, 23 N.Y.S.2d 552 (1940); Miller v. Ruehl, 166 Misc. 479, 2 N.Y.S.2d 394 (Sup.Ct.1938). Defendant claims that it therefore has an absolute right to enforce its membership oath so as to exclude plaintiffs from joining DGA.
 
 
 22
 On the other hand, the plaintiffs have precisely the property and contract interests which support an action for wrongful expulsion because of their previous membership in SDIG.[4] Moreover, the most compelling practical reason for reviewing union expulsions more rigorously than union admission policies stems from the added hardship and disruption that result when an established membership is revoked (particularly of course when that revocation may affect existing employment rights). From this standpoint, plaintiffs certainly deserve the added protection of judicial scrutiny. Although no New York case has dealt with the question of expulsion by merger,[5] one federal court has treated as an unlawful expulsion a union reincorporation consummated for the purpose of excluding from the successor organization a dissident group. Calabrese v. United Ass'n of Journeymen, 211 F.Supp. 609 (D.N.J.1962), aff'd per curiam, 324 F.2d 955 (3 Cir.1963). That case is distinguishable to the extent that it involved union bad faith, but we think the same protection should also be conferred upon the members of any union whose officers jeopardize membership status by negotiating a merger with another more restrictive union.
 
 
 23
 Moreover, the property and contract theories for reviewing union expulsions are not a true reflection of the economic and social interests actually involved in the regulation by unions of their membership. The question of wrongful expulsion can be better analyzed, from the standpoint of the union's interests as well as those of the member, in terms of liability for the tortious infliction of economic injury. See Chafee, supra, at pp. 1007-10; Cox, supra at p. 614. In many other contexts, the New York courts have adopted the "prima facie tort" doctrine,[6] and several cases indicate that this doctrine has relevance to the question of whether a deprivation of union membership was lawful. See Barile v. Fisher, 197 Misc. 493, 94 N.Y.S. 2d 346 (Sup.Ct.1949); compare Madden v. Atkins, 4 N.Y.2d 283, 174 N.Y.S.2d 633, 151 N.E.2d 73, 74 A.L.R.2d 772 (1958). See also Berrien v. Pollitzer, 83 U.S.App.D.C. 23, 165 F.2d 21 (1947). Given the plaintiffs' strong interest here in continuing membership in a union of film and television directors, we do not think that the New York courts would refuse them relief for the reason that they had no "vested" contract or property rights in DGA membership. Therefore, we treat the question of whether DGA's conduct was lawful as though plaintiffs had been expelled from DGA membership.[7]
 
 
 24
 B. Is the Oath a Valid Requirement?
 
 
 25
 Plaintiffs contend that the merger agreement had the effect of adding the oath requirement to their union's constitution, and that expulsion of an existing member on the basis of such an amendment violates the member's contract rights with the union. Plaintiffs argue that such an expulsion should be unlawful just as an expulsion not authorized by the union's constitution or by-laws is unlawful. See Polin v. Kaplan, 257 N.Y. 277, 177 N.E. 833 (1931). We disagree.
 
 
 26
 We think the New York courts would permit a union to enforce any reasonable provision in its constitution and by-laws regardless of whether the provision was enacted prior to the admission of the member who disobeys it. See Dyer v. Occidental Life Ins. Co., 182 F.2d 127, 17 A.L.R.2d 923 (9 Cir.1950). Union issues and interests change with time; surely the union must be free to amend its operative rules in response to such changes. That a change in a union's constitution is adverse to the interests of some members is not by itself proof that the change is unreasonable. In the only case in point, a lower New York court upheld a union expulsion based upon an amendment of the union's constitution which prohibited Communist party membership. Weinstock v. Ladisky, 197 Misc. 859, 98 N.Y.S.2d 85 (Sup. Ct. 1950). We see no good reason to reject that decision.
 
 
 27
 Plaintiffs' other argument,[8] and the one with which we agree, is that failure to sign the DGA oath is an unreasonable substantive ground for expelling a member from his union.
 
 
 28
 Despite numerous dicta to the effect that a court will not review the "merits" of a union expulsion, see Madden v. Atkins, 4 N.Y.2d 283, 297, 174 N.Y.S.2d 633, 643, 151 N.E. 73, 80, 74 A.L.R.2d 772 (1958) (concurring opinion), in a large group of New York cases expulsions have been voided when the substantive ground for the union's action was unreasonable, against public policy, or "contrary to natural justice." See generally Cox, supra at 615; Summers, Legal Limitations on Union Discipline, supra. This doctrine has been used to police a multitude of sins. For example, it has been invoked when an expulsion was purportedly based upon a cause "so trivial and unimportant as to suggest bad faith on the part of the union." Tesorio v. Miller, 274 App.Div. 670, 88 N.Y.S.2d 87 (1949). More frequently, it has been used to prevent unions from punishing members who criticize union officers, or who exercise their civil and political rights contrary to the wishes of the union's officers.[9]
 
 
 29
 In determining the reasonableness of the substantive provision upon which a union expulsion is based, the New York courts seem to have adopted the prima facie tort approach: they look to whether the union was justified in expelling the member for the reason given. Compare note 6 supra. In deciding this question, the courts will examine whether the provision is necessary for the union's welfare and whether it was invoked in good faith and without malice. See Nilan v. Colleran, 283 N.Y. 84, 27 N.E. 2d 511 (1940); O'Keefe v. Local 463, 277 N.Y. 300, 14 N.E.2d 77, 117 A.L.R. 817 (1938). In this case, there is no charge that the DGA oath requirement was applied to these plaintiffs in bad faith. Our only questions, therefore, are whether the union has a bona fide interest in excluding Communists and other subversives from membership and, if so, whether the DGA oath is a reasonable method of furthering that interest.
 
 
 30
 In our opinion, the union's interest in guarding against the danger of Communist infiltration is not, as a legal matter, open to question. The legislative history of the recent Labor Management Reporting and Disclosure Act is replete with discussions and proposals which demonstrate that Congress intended to leave unions free to keep out Communists.[10] As early as 1947, thirty national and international unions had provisions excluding Communists from membership, see Summers, The Right to Join a Union, 47 Colum.L.Rev. at 34, and numerous judicial decisions have upheld the propriety of such a rule.[11]
 
 
 31
 Some commentators have criticized any attempts by unions to regulate the "external" political beliefs of their membership. See Aaron & Komaroff, Statutory Regulation of Internal Union Affairs, 44 Ill.L.Rev. 631, 655 (1949). However, we think it not unreasonable to believe that the Communist party has in the past demonstrated that it poses a significant threat to the American labor movement. Perhaps in some unions this threat would be sufficiently met by a provision prohibiting Communists from holding union office. But in an organization such as DGA, whose members perform vital tasks in the sensitive communications industry, we cannot say that a provision excluding Communists from any membership is contrary to public policy or "natural justice." The former "witch hunts" and "blacklisting" of DGA members by the public and by the Hollywood film industry would have justified DGA's adoption of some form of exclusionary provision for its own self-protection. Thus, we do not consider DGA's purpose in enacting its oath unreasonable.
 
 
 32
 Our condemnation of the DGA oath is a narrow one, namely, that this particular oath, because of its vagueness, is an impermissible method of furthering the union's valid interest in protecting itself against Communist infiltration. As to this question, there are no cases directly in point. However, we are guided by the recent Supreme Court decisions which have struck down broad and vague loyalty oaths applied as a condition precedent to various kinds of government employment. See Elfbrandt v. Russell, 382 U.S. 116, 86 S.Ct. 1238, 16 L.Ed.2d 321 (April 18, 1966); Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); Cramp v. Board of Public Instruction, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); Garner v. Board of Public Works of City of Los Angeles, 341 U.S. 716, 725, 71 S. Ct. 909 (1951) (concurring opinion of Mr. Justice Frankfurter).[12]
 
 
 33
 Any loyalty oath aimed at uncovering subversives is subject to the obvious criticism that it is likely to be ineffective because subversives as a rule will not hesitate to sign it. Nevertheless, when dealing with the DGA situation, the union can reply that, an oath serves the laudable purpose of allaying the public's fears that the union has been infiltrated by Communists. Whether or not adoption of an oath is a rational indication of a union's patriotism, we cannot say that this argument is without merit.
 
 
 34
 However, the specific oath adopted by DGA is subject to more serious criticism. In the first place, as the affidavits filed by plaintiffs in this case illustrate, this oath like N.L.R.A. § 9(h) is offensive to non-Communist labor leaders. See also United States v. Brown, 381 U.S. 437, 477, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965) (dissenting opinion). In the second place, because of its vagueness, the oath is a potential weapon for the punishment of those members who differ politically from the union's majority or who challenge the union's leadership.
 
 
 35
 Most important, the vagueness of this oath makes it impossible for signers to know exactly what it is that they are forbidden to do. What does it mean, for example, to "believe in * * * any organization that believes in * * * the overthrow of the United States government by any illegal or unconstitutional methods"? By such broad language, the oath may place substantial restrictions on the political activities of those who sign it conscientiously. It discourages them from joining political and other associations and from espousing controversial political positions. As Mr. Justice Frankfurter explained in his concurring opinion in Garner v. Board of Public Works of City of Los Angeles, 341 U.S. at 727-728, 71 S.Ct. 909, 916:
 
 
 36
 Not only does the oath make an irrational demand. It is bound to operate as a real deterrent to people contemplating even innocent associations. How can anyone be sure that an organization with which he affiliates will not at some time in the future be found by a State or National official to advocate overthrow of government by `unlawful means' [in the DGA oath, `illegal methods']? All but the hardiest may well hesitate to join organizations if they know that by such a proscription they will be permanently disqualified from public employment [here union membership, which significantly affects employment]. These are considerations that cut deep into the traditions of our people.
 
 
 37
 * * * * * *
 
 
 38
 Such a demand is at war with individual integrity; it can no more be justified than the inquiry into belief which Mr. Justice Black, Mr. Justice Jackson and I deemed invalid in American Communications Assn. v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 [which involved an oath substantially identical to the one here, see text at note 1, supra].
 
 
 39
 Not only do the vague portions of the DGA oath seem to limit unreasonably the political freedom of the union's membership, but we also fail to see sufficient connection between failure to sign the oath and the union's interest in weeding out Communists. Normally, while a union may engage in political activities as an organization, it has no justifiable interest in regulating the political beliefs of its membership, at least where those beliefs have not been translated into conduct that is inimical to the union's interests. See Cox, 72 Harv.L. Rev. at 617-18. An exception is made in the case of Communist beliefs because it has been established that those who harbor such beliefs have an overriding loyalty to an ideology at odds with that of the American labor movement, and because of the great likelihood that Communists will use their influence in unions to foster illegal and undesirable activity such as the political strike. See Communications Ass'n v. Douds, 339 U.S. at 425-433, 70 S.Ct. 674 (opinion of Mr. Justice Jackson). But when a union chooses to expel persons because of suspected Communist beliefs rather than objective harmful conduct, we think that the basis for its suspicion must truly indicate dangers against which the union is justified in acting. Here, those aspects of Communism which seriously threaten the union's interests are not present in the milder forms of beliefs and organizations which members who signed the oath might well be discouraged from espousing, supporting or joining. Therefore, those who refuse to sign such a broad oath do not necessarily manifest the type of political beliefs which the union may properly guard against. Under these circumstances, we think that this oath goes beyond what the union's interests reasonably require, that its enforcement serves to deter, the political activity of the union members, and that failure to sign it is an insufficient indication of Communist beliefs to warrant expulsion from the union.
 
 
 40
 We do not challenge the union's right to exclude or expel a person from membership if it is established that he has engaged in subversive activity or if it is established that he is a member of the Communist party. See Rosen v. District Council No. 9, 198 F.Supp. 46 (S.D. N.Y.1961). Nor do we necessarily condemn all forms of union loyalty oaths. But, no matter what reasons led to its enactment, or how the union has chosen to enforce it, we cannot uphold those portions of this DGA provision which do not serve the valid purpose of weeding out Communists and subversives, and which may seriously encroach upon the political freedom of individual DGA members.
 
 
 41
 There has been no suggestion raised in this suit that the plaintiffs are in fact members of the Communist party or of any subversive organization. Plaintiffs' affidavits reveal that they are film and television directors of long standing who have worked for such employers as the United Nations, the United States Navy, the United States Information Agency, the State of New York, the Radio Free Europe Fund, and many others. Plaintiffs have attacked the DGA oath solely as a matter of principle and DGA has chosen to defend the oath on that basis. Since the only question of fact which the union has claimed is relevant involves whether DGA has a bona fide interest in excluding Communists from membership, a question which we decide in the union's favor, and since we hold as a matter of law that the DGA oath is unreasonable because of its inherent vagueness, we see no reason for remanding the case for trial on the "merits."
 
 
 42
 However, the case must be remanded for the fashioning of appropriate relief. Although reinstatement — perhaps we should say admission — of plaintiffs to DGA without regard to their signing the oath is clearly warranted, triable issues may well develop with respect to the scope of the final order. Accordingly, the cause is remanded for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 61 Stat. 136, 146 (1947), repealed, Public Law 86-257, 73 Stat. 525 (1959)
 
 
 [2]
 Plaintiffs also allege that the DGA oath is contrary to § 102 of the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 412; § 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a); and the First and Fifth Amendments to the United States Constitution. As there are substantial difficulties with all these theories, not the least of which is the fact that DGA appears to be a union of supervisory employees not subject to the NLRA, we decline to discuss them. There is diversity jurisdiction for the common law count, and the parties have assumed that New York law applies
 
 
 [3]
 In New York, the analysis was derived from cases involving fraternal insurance associations, Wilcox v. Supreme Council of the Royal Arcanum, 210 N.Y. 370, 104 N.E. 624, 52 L.R.A.,N.S., 806 (1914), the New York Stock Exchange, Cohen v. Thomas, 209 N.Y. 407, 103 N.E. 708 (1913), the New York Produce Exchange, People ex rel. Johnson v. New York Produce Exchange, 149 N.Y. 401, 44 N.E. 84 (1896), and the like
 
 
 [4]
 All the assets of SDIG, including union rights under its 170 collective bargaining agreements with industry employers, passed to DGA upon execution of the merger
 
 
 [5]
 In Dunne v. Hoffa, 231 N.Y.S.2d 352 (Sup.Ct.1962), the court upheld a merger of seven local unions because the combined membership of the seven had approved the merger even though the plaintiff's local had disapproved it. However, the court expressly noted that there had been no proof that the merger would have any adverse effect on the members of plaintiff's local
 
 
 [6]
 Under this doctrine, "[P]rima facie, the intentional infliction of temporal damages is a cause of action, which, as a matter of substantive law * * * requires a justification if the defendant is to escape." Aikens v. Wisconsin, 195 U.S. 194, 204, 25 S.Ct. 3, 5, 49 L.Ed. 154 (1904) (Mr. Justice Holmes). See Advance Music Corp. v. American Tobacco Co., 296 N.Y. 79, 70 N.E.2d 401 (1946); Opera on Tour, Inc. v. Weber, 285 N.Y. 348, 34 N.E.2d 394, 136 A.L.R. 267 (1941).
 
 
 [7]
 In view of this conclusion, we need not reach the plaintiffs' alternative contention that we recognize a cause of action for wrongful exclusion. However, if the denial of union membership is analyzed from the standpoint of tort liability, as we think it should be, we see no sound reason why recovery should not be granted for wrongful exclusion as well as wrongful expulsion. See Blumrosen, Legal Protection Against Exclusion from Union Activities, 22 Ohio St.L.Rev. 21 (1961). This is not to say that the valid grounds for exclusion and expulsion would necessarily coincide — the desirability of allowing unions considerable freedom in selecting their members, plus the more limited injury that normally results from exclusion as opposed to expulsion, would in many cases argue for a very limited review of exclusion policies. But whenever a union reaches a position in an industry where it has a "monopoly" on the employment opportunities within its sphere of influence, we think it can no longer rightfully claim that it, like a social club, should be free to deny the economic benefits of its membership in an arbitrary or discriminatory manner. See James v. Marinship Corp., 25 Cal.2d Cal.2d 721, 155 P.2d 329, 160 A.L.R. 900 (1945). But see Oliphant v. Brotherhood of Locomotive Firemen, 262 F.2d 359 (6 Cir.), cert. denied, 359 U.S. 935, 79 S.Ct. 648, 3 L.Ed.2d 636 (1959). On this record, we would conclude that DGA has such influence over the employment of directors as a result of this merger
 
 
 [8]
 We do not accept any suggestion by plaintiffs that their "expulsion" was wrongful because they were not afforded a procedurally adequate hearing; no hearing is necessary to determine that plaintiffs did not sign the oath. Cf. Figueroa v. National Maritime Union, 342 F.2d 400, 406 (2 Cir. 1965), reversing 55 L.R.R.M. 2743 (S.D.N.Y.1964). A more refined argument would be that this summary expulsion was an arbitrary action because an inference of disloyalty may not reasonably be derived from a member's failure to sign the oath. See Heckler v. Shepard, 243 F.Supp. 841, 848-849 (E.D.Idaho 1965) (three-judge court). Although we do not consider this question, we think it is far preferable to base union expulsion upon the commission of an objective act of disloyalty or subversion, such as Communist party membership, see Dakchoylous v. Ernst, note 11 infra, so that the accused member is given an opportunity to establish that he is worthy of membership
 
 
 [9]
 See Madden v. Atkins, supra (members criticized union officers); Angrisani v. Stearn, 167 Misc. 728, 3 N.Y.S.2d 698 (Sup.Ct.), aff'd mem., 255 App.Div. 975, 8 N.Y.S.2d 997 (1938) (member sued the union and its officers); Reilly v. Hogan, 32 N.Y.S.2d 864 (Sup.Ct.), aff'd mem., 264 App.Div. 855, 36 N.Y.S.2d 423 (1942) (member charged union officers with misappropriating funds) (dictum); Summers, 64 Harv.L.Rev. at 1068-69. See also Gallaher v. American Legion, 154 Misc. 281, 277 N.Y.S. 81 (Sup.Ct.), aff'd, 242 App.Div. 630, 271 N.Y.S. 1109 (1934) (local post asserted a position on legislation at odds with that of national organization)
 
 
 [10]
 Indeed, Congress has twice acted against the danger to the public when Communists serve as union officers. N.L.R.A. § 9(h), 29 U.S.C. § 159(h); L.M.R.D.A. § 504, 29 U.S.C. § 504. The first of these provisions was repealed in 1959 and the second was declared unconstitutional (as a bill of attainder) in United States v. Brown, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965). Nevertheless it seems clear that the national public policy against Communist infiltration of unions retains vitality
 
 
 [11]
 See, e. g., Dakchoylous v. Ernst, 203 Misc. 277, 118 N.Y.S.2d 455 (Sup.Ct. 1952), aff'd, 282 App.Div. 1101, 126 N.Y.S.2d 534 (1953); Weinstock v. Ladisky, supra; International Ass'n of Machinists v. Friedman, 102 U.S.App.D.C. 282, 252 F.2d 846 (D.C.Cir.1958); Rosen v. District Council No. 9, 198 F.Supp. 46 (S.D.N.Y.1961); Tisa v. Potofsky, 90 F.Supp. 175 (S.D.N.Y.1950). See also Ames v. Dubinsky, 5 Misc.2d 380, 70 N.Y.S.2d 706 (Sup.Ct.1947)
 
 
 [12]
 These cases are useful for the light they shed on the practical effects of loyalty oaths. We do not in any way intimate that unions are subject to the same constitutional restrictions as governmental subdivisions. See Oliphant v. Brotherhood of Locomotive Firemen, 262 F.2d 359 (6 Cir.), cert. denied, 359 U.S. 935, 79 S.Ct. 648, 3 L.Ed.2d 636 (1959)